Filed 7/7/21  P. v. Fisher CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br>v.<br>CORY JORDAN FISHER, SR.,<br><br>        Defendant and Appellant. | A157214<br><br>(Humboldt County<br>Super. Ct. No. CR1703891) |

This is an appeal from final judgment after a jury convicted defendant Cory Jordan Fisher, Sr., of numerous felony crimes relating to the ongoing sexual abuse of his two young stepsons, John Doe 1 and John Doe 2, and his biological son, John Doe 3.  Defendant was sentenced to a total prison term of 106 years to life.

Seeking reversal, defendant contends that the trial court engaged in evidentiary and instructional error; his convictions on certain counts violate the constitutional prohibition on ex post facto laws; his sentence constitutes cruel and unusual punishment; the statutory restrictions on the right to a youth offender parole hearing violate the equal protection clause; and the requirement to pay certain punitive fines violates the due process and equal protection clauses given his inability to pay.

1

We conclude that defendant's convictions on counts 1, 4, and 5 must be reversed under the constitutional prohibition on ex post facto laws. In all other regards, we affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

On September 12, 2018, an information was filed charging defendant with aggravated sexual assault (oral copulation) of John Doe 1 (Doe 1), a child under age 14, on or between August 1, 2005, and June 1, 2007 (Pen. Code, § 269, subd. (a)(4); count 1);[1] forcible lewd act on Doe 1, a child under age 14, on or between June 2, 2007, and October 27, 2009 (§ 288, subd. (b)(1); count 2); continuous sexual abuse of Doe 1, a child under age 14, on or between July 1, 2005, and October 27, 2009 (§ 288.5, subd. (a); count 3); oral copulation or sexual penetration of John Doe 2 (Doe 2), a child 10 years old or younger, on or between October 22, 2007, and April 1, 2008 (§ 288.7, subd. (b); count 4); oral copulation or sexual penetration of Doe 2, a child 10 years old or younger, on or between October 22, 2007, and September 30, 2009 (§ 288.7, subd. (b); count 5); forcible lewd act on Doe 2, a child under age 14, on or between October 22, 2007, and May 31, 2010 (§ 288, subd. (b)(1); count 6); forcible lewd act on Doe 2, a child under age 14, on or between October 22, 2007, and May 31, 2010 (§ 288, subd. (b)(1); count 7); lewd act on John Doe 3 (Doe 3), a child under age 14, on or between March 1, 2017, and April 6, 2017 (§ 288, subd. (a); count 8); and battery with serious bodily injury upon Doe 2 on or about June 25, 2017 (§ 243, subd. (d); count 9). As to counts 2, 3, 6, 7 and 8, it was specially alleged that, within the meaning of section 667.61, subdivisions (b) and (e), the offense was committed against more than one victim.

---

[1] Unless otherwise stated, all statutory citations herein are to the Penal Code.

2

The information also charged defendant with forcible oral copulation upon James Doe 1 (former § 288a, subd. (c)(2)(A); count 10); sexual battery upon James Doe 1 (§ 243.4, subd. (e)(1); count 11); sexual battery upon James Doe 2 (§ 243.4, subd. (e)(1); count 12); and sexual battery upon James Doe 3 (§ 243.4, subd. (e)(1); count 13).

Trial began on February 26, 2019, and revealed the following evidence.[2]

## I.     Prosecution's Case.

Defendant's wife, Angela, had two sons from a previous relationship, Doe 1 and Doe 2. Doe 1 was born October 28, 1995. Doe 2 was born October 1, 1998.

In or around March 2005, Angela met defendant, 12 years her junior,[3] when he coached Doe 1's baseball team. The pair soon began dating, and in the summer of 2005 Angela learned that she was pregnant. In August 2005, Angela, defendant and Does 1 and 2 moved into a house in Eureka on Williams Street. Doe 3, defendant's biological son, was born on April 7, 2006, and the couple were married later that year. Shortly thereafter, defendant became a sworn peace officer and was employed as a corrections officer at the county jail.

In May or June 2007, the family moved to a bigger house on Pine Street. They lived there until September 2010, when they moved to a house on Central Avenue, also in Eureka.

---

[2] Counts 10–13 related to allegations of sexual abuse as to James Doe 1, 2, and 3, three inmates at the jail at which defendant was previously employed as a corrections officer. The jury acquitted defendant of these charges. Accordingly, we omit discussion of the related evidence from this opinion.

[3] Defendant was born on April 15, 1987.

A.    *Doe 1.*

While defendant was his baseball coach, Doe 1 looked up to him as a father figure and felt "cool" when defendant let him smoke cigarettes in alleyways before games.  Doe 1 was initially pleased when Angela began dating defendant.  However, defendant became very controlling of Doe 1, even limiting his play with other children, running "checks" on his friends' parents, and making his teachers sign papers confirming that Doe 1 behaved and attended class.

Defendant became physically abusive to Doe 1 after the family moved to Williams Street in 2005, causing Doe 1 to become afraid of him.  Once, defendant picked Doe 1 up by the shirt and punched holes in the drywall around his head.  Defendant frequently "death gripp[ed]" his hand or stomped on his toes if Doe 1 misbehaved in public.  Defendant also used a TASER gun on Doe 1, supposedly to confirm it worked.

1.    Sexual Abuse on Williams Street:  August 2005–Summer 2007.

In 2005, when Doe 1 was nine or ten years old, defendant began sexually abusing him at the Williams Street house.  Doe 1 and Doe 2 shared a bedroom, sleeping in bunk beds, Doe 1 in the bottom bunk and Doe 2 in the top.  Defendant often tucked the boys in at night.  The first incident of sexual abuse occurred when Doe 1 and Doe 2 were being tucked into bed by defendant, who pulled down his own pants and exposed his genitals to Doe 1.  As defendant continued to tuck Doe 2 into the top bunk, defendant began to masturbate himself before gesturing to Doe 1 to masturbate him.  When Doe 1 resisted, defendant grabbed the child's hand and forced him to stroke defendant's erect penis.  Doe 1 complied because he was scared.  The incident ended when Doe 1 heard someone walking down the hallway and defendant pulled up his pants.

4

While the family lived on Williams Street, defendant also repeatedly forced Doe 1 to masturbate him in the bunk bed. After this occurred numerous times, defendant held Doe 1's head and forced his erect penis into the child's mouth. Doe 1 complied because defendant was an "intense overbearing person . . . ." During one such oral copulation, defendant ejaculated in Doe 1's mouth, which made Doe 1 panic and wash out his mouth with hand sanitizer and dish soap.

While the family lived on Williams Street, Doe 1 was forced to masturbate or orally copulate defendant at least twice a week. Generally, Angela was away or asleep. On one such occasion, defendant removed his pants and lay behind Doe 1 on his bunk bed. Wrapping his arms tightly around Doe 1, defendant tried to insert his penis into Doe 1's anus, causing him tremendous pain. Defendant then took Doe 1 into his bedroom, bent Doe 1 over the bed and applied lubricant to defendant's penis. Doe 1 told him he did not want him to do this, enraging defendant so much that his face became red.

### 2. Sexual Abuse on Pine Street: May/June 2007–September 2010.

After the family moved to Pine Street in the summer of 2007, the nature of defendant's abuse changed. Instead of forcing Doe 1 to masturbate or orally copulate him, defendant forced Doe 1 to be masturbated or orally copulated. On one occasion, defendant entered Doe 1's room unexpectedly while Doe 1 was watching pornography on his computer. Defendant "forcefully masturbated" Doe 1 while watching a video. Doe 1 finally ended the incident by pulling up his own pants and leaving.

Other times, defendant forced Doe 1 to allow defendant to orally copulate him in exchange for certain privileges, such as going to a friend's house, or to avoid punishment if Doe 1 misbehaved. For example, once, Doe 1

had a friend over and the pair watched a television channel that was off limits. Defendant told Doe 1 that he had to agree to oral copulation to avoid trouble. Defendant then forcefully orally copulated Doe 1 until Doe 1 ejaculated. This type of incident occurred 15 to 20 times at the Pine Street residence while Doe 1 was between 11 and 14 years old.

Another incident occurred when defendant and Doe 1 were soaking in an inflatable hot tub in the Pine Street basement. Defendant told Doe 1 he would be "in a world of trouble" if he did not place his penis in defendant's anus. Defendant then forced Doe 1 to sodomize him.

During this time, defendant continued to physically abuse Doe 1, once punching him, sitting on top of him and choking him.

Also during this time, defendant took Doe 1 camping in Humboldt County. The campground was full, so defendant used his peace officer badge when asking a man and his wife to share their campsite. The couple agreed, and defendant and Doe 1 set up their tent about 30 feet from the couple's tent. Later that evening, defendant forced Doe 1 to drink whiskey. As Doe 1 became intoxicated for the first time, he admitted to defendant that he once smoked marijuana. Doe 1 began to cry, believing he was in trouble. Defendant then orally copulated Doe 1 and told him his mother did not need to know about their sexual activity.[4]

---

[4] The man who allowed defendant and Doe 1 to share his campsite later made a report to law enforcement about possible sexual abuse. According to his report, around 10 p.m. the man heard Doe 1 crying in the tent and pleading, " 'Please don't. It hurts. Take it out.' " Defendant responded, " 'That's my boy. That's my boy.' " An investigation ensued, but Doe 1 told the investigator that he had a rock stuck in his foot and defendant was helping him remove it. The investigator also spoke to defendant, who denied any sexual abuse. Defendant consented for Doe 1 to receive a sexual assault examination, but none ever took place. Defendant testified that he took a polygraph at the investigator's request. Ultimately, the investigator

3.  Sexual Abuse on Central Avenue:  September 2010.

After the family moved to a Central Avenue home in September 2010, defendant masturbated or orally copulated Doe 1 once or twice monthly, mostly in Doe 1's bedroom.  Defendant forced Doe 1 to comply in order to gain permission to see his girlfriend.  Doe 1 eventually started to spend most of the day in his room, avoiding his friends and girlfriends.

Doe 1 did not tell Angela about the sexual abuse because defendant said that she would not believe him.  Doe 1 also feared that defendant would severely beat him if he told anyone and that the family would struggle without defendant's financial support.

When Doe 1 was about 16 years old, defendant cornered him in the bathroom and began "aggressively" moving toward him.  Doe 1 punched him multiple times in the face and chest, knocking defendant unconscious.  Even after this incident, defendant continued to sexually molest Doe 1 by giving him alcohol or prescription pills that left Doe 1 unable to physically resist.

When he reached age 17, Doe 1 enlisted in the Army to get away from defendant's abuse.  When he left, Doe 1 threatened defendant that if he ever abused his brothers, Doe 1 would kill defendant.  Doe 1 told defendant that in return he would not disclose his abuse.

---

concluded that the reporter may have misinterpreted what he heard. However, after the other sexual abuse allegations came to light, the investigator contacted Doe 1 again to discuss the camping trip.

At trial, the trial court admitted evidence regarding the man's report of this camping incident to law enforcement "for the limited purpose of giving meaning to the investigation that followed."

B.    *Doe 2.*

1.    Sexual Abuse on Williams Street:  August 2005–Summer 2007.

Doe 2 was between six and eight years old when the family lived on Williams Street.  Doe 2 frequently wet his pants at school.  Defendant would take Doe 2 into the bathroom after he returned from school and put rubbing alcohol on his "butt," telling Doe 2 that it would keep him from wetting his pants.  Defendant would then remove Doe 2's pants and fondle his penis.  Defendant told Doe 2 that the touching was their " 'little secret' " and that no one would believe Doe 2 if he disclosed it.

Two or three times, defendant "disciplined" Doe 2 for wetting his pants by draping him over the bathtub, removing his pants, and humping or rubbing his penis against Doe 2's "butt crack."  When doing this, defendant was very aggressive, gripping Doe 2's torso and telling Doe 2 to "shut up" when he cried or begged defendant to stop.

Also at the Williams Street house, defendant frequently forced Doe 2 to take naps with him.  Doe 2 would fall asleep and awaken to find defendant fondling his penis.  The first time this occurred, Doe 2 told defendant to stop and tried to sit up, but defendant pushed him down and continued.

At some point the nature of defendant's naptime conduct changed.  At least four times on Williams Street, Doe 2 awoke from his nap to find defendant orally copulating him with his hands wrapped around Doe 2's buttocks.

2.    Sexual Abuse on Pine Street:  May/June 2007–September 2010.

After the family moved to Pine Street, the abuse continued, with Doe 2 once waking to find defendant aggressively humping Doe 2's "butt crack" with his penis.  The first such incident occurred when defendant, who worked

night shifts, demanded that Doe 2 take a nap even after Doe 2 protested that he had homework. Finally obeying, Doe 2 went and lay on his side in defendant's bed while defendant lay down behind him. When Doe 2 fell asleep, defendant removed the child's clothes and humped Doe 2's "butt crack" with his penis. Defendant then pushed Doe 2 onto his stomach and ejaculated on his back.

Once, when defendant was aggressively humping Doe 2 from behind, defendant's penis almost entered Doe 2's anus. Doe 2 felt "really strong pain . . . ." When Doe 2 cried, defendant told him "to shut up" and continued attempting to penetrate Doe 2 until he turned Doe 2 onto his stomach and ejaculated onto his back. Defendant attempted to penetrate Doe 2's anus more than once.

On another occasion at the Pine Street house, defendant orally copulated Doe 2's penis after making Doe 2 nap in defendant's bed.

3. Sexual Abuse on Central Avenue: September 2010.

Doe 2 entered puberty after the family moved to the Central Avenue house. Defendant forced Doe 2 to masturbate in front of him, despite Doe 2's protestations. Defendant then masturbated next to Doe 2 while Doe 2 masturbated. This forced masturbation happened "more than once" on Central Avenue. Both times, Doe 2 complied even though he did not want to do it because defendant was extremely aggressive.

When Doe 2 was in high school, defendant slept in Doe 2's bed with him every night. Because defendant was so controlling of Doe 2, the child rarely went to his friends' houses. Doe 2 realized that defendant's abuse was wrong, and he repeatedly told defendant that it was strange for a grown man to sleep in a teenager's bed. However, defendant continued his behavior. In doing so, defendant frequently forced Doe 2 to consume alcohol and

9

" 'nighttime medicine' " that would make Doe 2 "black out" and recall nothing when he awoke. Defendant would become angry and hit Doe 2 if Doe 2 tried to refuse the medicine. Doe 2 suspected that defendant molested him when he blacked out.

The last time that Doe 2 recalled defendant molested him was when he was 16 years old. Doe 2 awoke to find defendant attempting to touch him. Doe 2 became extremely angry and ordered defendant to stop, prompting defendant to hold him down and deny doing anything wrong. Enraged, Doe 2 kicked a hole in the wall, trying to free himself, while defendant sat on his chest so hard that he "cracked" Doe 2's rib.

Doe 2 also testified about other forms of defendant's abuse. Defendant commonly threw objects at Doe 2, including remote controls, phones and full soda cans, and backhanded him with great force. Defendant also forced Doe 2 to accompany him wherever he went and showed up randomly at Doe 2's school, even sitting in on one of his classes. This behavior embarrassed Doe 2 and made him uncomfortable.

C.    *Doe 3: Sexual Abuse on Central Avenue.*

Doe 3, age 12 at trial, testified that defendant did "something inappropriate" to him when he was in the fifth grade. The two were watching a movie together in Doe 3's bed when defendant asked him whether his "pee-pee" was hard. Defendant then tried to touch Doe 3's penis with his hand over Doe 3's pajamas. Defendant rubbed Doe 3's thigh next to the child's penis. Knowing this was wrong, Doe 3 told defendant to stop. Defendant complied and left the bedroom.

Doe 3 described defendant as often controlling and angry. Doe 3 was afraid of defendant, having witnessed defendant's violence toward his

10

brothers, especially Doe 1.  Once, defendant violently grabbed Doe 3 and threw him across a hallway, knocking the wind out of him.

D.    *Disclosure of Defendant's Abuse.*

On June 25, 2017, Doe 2, age 18, tried to leave the house after defendant became "angry and confrontational . . . ."  Defendant, who had been drinking, pushed Doe 2 to the ground and " 'demand[ed] respect.' "  Defendant then punched Doe 2 in the face and choked him, shattering his eye socket, breaking his nose, and cracking his ribs.  Angela hit defendant over the head to stop his attack before calling the police.

After finding out about the attack, Doe 1, deployed in Afghanistan, called Doe 2.  After a heartfelt conversation, Doe 1 and Doe 2 both acknowledged having been sexually abused by defendant.  Doe 1 had not told anyone about this abuse except for his wife.  Doe 1 later spoke to his chaplain in Afghanistan, who encouraged Doe 1 to call the police.

The brothers subsequently told Angela about defendant's sexual abuse.  Doe 1 did so after telling Angela that his wife was pregnant and that he did not want defendant around the baby.  When Angela asked why, Doe 1 replied that defendant had molested him his entire childhood.  Angela was shocked.  Nevertheless, she did not call the police because she worried about the stress and humiliation it would cause her sons.  However, after Angela eventually discussed the matter with her best friends, one of the friends made a police report in August 2017.  Defendant was arrested on September 15, 2017.

Dr. Anthony Urquiza, a clinical psychologist and director of the child abuse treatment program at the University of California, Davis, Medical Center, testified that it is common for victims of sexual abuse to delay reporting it.  Testifying about child sexual abuse accommodation syndrome, Dr. Urquiza explained its five aspects:  secrecy, helplessness, entrapment and

11

accommodation, delayed and unconvincing disclosure, and retraction or recantation. Briefly stated, this syndrome is a consequence of the fact that the sexual abuser of a child is often an older person with whom the child has an ongoing relationship. The abuser often manipulates the child by, among other things, threatening him or her emotionally or physically in order to maintain secrecy. The child victim, in turn, feels afraid and helpless and thus will often delay reporting the sexual abuse, give vague or incomplete descriptions, report the abuse over time in a piecemeal fashion, and/or recant his or her disclosures.

## II.    Defense Case.

Defendant denied sexually abusing his stepsons or biological son. Defendant admitted drinking too much and having a violent temper with frequent "[o]utbursts." He also acknowledged using a variety of prescription drugs while drinking, including Valium, Xanax and Prozac, explaining that his job as a corrections officer was very stressful and he often came home angry and aggressive. Among other incidents, defendant admitted breaking Angela's nose when she was pregnant; throwing objects at his stepsons and son; punching Doe 1 on multiple occasions; and pushing Doe 3 down, knocking the air out of his lungs. According to defendant, Does 1, 2 and 3 had reason to be bitter toward him.

## III.    The Jury Verdict, Sentencing and Appeal.

On April 4, 2019, the jury found defendant guilty of counts 1–9 and not guilty of counts 10–13. The jury found true the allegations that defendant committed the offenses charged in counts 2–3 and 6–8 against more than one victim for purposes of section 667.61, subdivision (b), commonly referred to as the One Strike law. The prosecutor thereafter successfully moved to dismiss count 3 and its section 667.61 enhancement.

12

On May 6, 2019, defendant was sentenced to state prison for 106 years to life. In reaching this total term, the court applied section 667.61, subdivision (b) to impose consecutive terms of 15 years to life on counts 2 and 4–8. The court also imposed various fines, fees and assessments, including a $1,000 penal fine (§ 672); a $10,000 restitution fine (§ 1202.4, subd. (b)); and a $10,000 parole revocation restitution fine, which was stayed (§ 1202.45). The court declined to impose a booking fee, revenue recovery for court-appointed counsel or a probation investigation fee, citing defendant's inability to pay. Finally, the court ordered defendant to pay Doe 3 $2,500 in victim restitution and reserved jurisdiction as to additional amounts.

Defendant filed a timely notice of appeal.

## DISCUSSION

Defendant seeks reversal of the judgment on the following grounds: (1) the trial court erroneously admitted evidence relating to his verbally abusive conduct on two occasions at Doe 1's middle school; (2) his conviction on count 1, aggravated sexual assault (oral copulation) on a child age 14 or younger (§ 269), violates the constitutional prohibition on ex post facto laws; (3) his convictions on counts 4 and 5, oral copulation or sexual penetration of a child age 10 or younger (§ 288.7), violate the constitutional prohibitions on ex post facto laws; (4) the trial court prejudicially erred by failing to instruct on certain lesser included offenses for purposes of counts 4 and 5; (5) his sentence violates the state and federal constitutional prohibitions on cruel and/or unusual punishment; (6) denying him a youth offender parole hearing based on section 3051, subdivision (h) was erroneous and violates the equal protection clause; and (7) imposition of certain punitive fines violates his constitutional rights to due process and equal protection. We address each issue to the extent appropriate below.

13

## I.     Evidence of Defendant's School Confrontations.

Defendant contends the trial court abused its discretion by admitting into evidence two confrontations he had at Doe 1's middle school.  As to the first, defendant was cross-examined regarding an incident in May 2009 when he was eating lunch with Doe 1 at his middle school's cafeteria and another student sat down at their table.  This student threatened to " 'beat [Doe 1's] fucking ass' " and then stated that he would also " 'beat [defendant's] fucking ass' " if he " 'weren't so big . . . .' "  Defendant reported the incident to the school's principal and, in the principal and student's presence, called the student a " 'fucking punk . . . .' "  The court subsequently overruled an objection and motion to strike from defense counsel, who argued the testimony was irrelevant and improper character evidence.

As to the second confrontation, the prosecutor elicited testimony about a September 8, 2008 incident in which defendant accused a teacher at the middle school of " 'being a fucking bitch.' "  The school principal later sent defendant a letter instructing him "to behave in a non-aggressive manner" while on campus.  Defense counsel made no specific objection to this testimony.

Generally speaking, all relevant evidence is admissible.  Nonetheless, under Evidence Code section 352, the trial court has broad discretion to admit or exclude relevant evidence upon weighing its probative value against its prejudicial effect.  (*People v. Champion* (1995) 9 Cal.4th 879, 922; Evid. Code, § 352.)  Only if the probative value of the evidence is substantially outweighed by its likely prejudicial impact should the court exclude it.  (See *People v. Tran* (2011) 51 Cal.4th 1040, 1047 [evidence is substantially more prejudicial than probative " '[only] if, broadly stated, it poses an intolerable "risk to the fairness of the proceedings or the reliability of the outcome" ' "].)

14

On appeal, a trial court's decision to admit or exclude evidence is reviewed for abuse of discretion. (*People v. Brown* (2003) 31 Cal.4th 518, 547; *People v. Avitia* (2005) 127 Cal.App.4th 185, 193.) "The trial court's ruling will not be disturbed in the absence of a showing it exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a miscarriage of justice." (*People v. Avitia, supra*, 127 Cal.App.4th at p. 193; see *People v. Dyer* (1988) 45 Cal.3d 26, 73.)

Here, even putting aside defense counsel's failure to object to the evidence that defendant cursed at a teacher,[5] we find nothing arbitrary, capricious, or patently absurd about the trial court's admission of evidence relating to both incidents. As the trial court noted, Doe 2 testified that defendant sometimes showed up at school, which he found unusual and unsettling.[6] The evidence of defendant's outbursts at the school also supported the boys' testimony regarding defendant's controlling nature. As the prosecutor successfully argued below, these confrontations demonstrated that defendant "maintain[ed] a dominant, aggressive, controlling role within [the boys'] lives," which, consistent with expert testimony, could explain why they submitted to his abuse and why they waited so long to report it.[7]

---

[5] While we deem defendant to have forfeited the right to challenge the admission of evidence regarding his use of profanity toward a teacher, we nonetheless consider both incidents collectively on the merits. (See *People v. Williams* (1997) 16 Cal.4th 153, 206 [failure to raise a specific objection below forfeits the right to challenge admission of evidence on appeal].)

[6] Defendant acknowledged that he sometimes showed up at Doe 1's and Doe 2's schools unexpectedly, for example, to bring them lunch or take them out to lunch.

[7] As mentioned, Dr. Anthony Urquiza testified regarding child sexual abuse accommodation syndrome and the tendency of young victims to delay reporting and submit to the sexual abuse.

Accordingly, the challenged evidence was relevant to the issues raised in this case, including the victims' credibility. (See *People v. Robertson* (2012) 208 Cal.App.4th 965, 993 ["Since appellant flatly denied raping the victim in this case and there was no forensic evidence proving that a rape occurred, evidence bearing on the respective credibility of appellant and the victim was highly probative"]; *People v. Burgener* (2003) 29 Cal.4th 833, 869 ["An explanation of the basis for the witness's fear is . . . relevant to her credibility and is well within the discretion of the trial court"].) Contrary to defendant's argument, the challenged evidence did not merely invite "the very type of character-based inference which Evidence Code section 1101, subdivision (a) prohibits." (See Evid. Code, § 1101, subd. (c) ["Nothing in this section affects the admissibility of evidence offered to support or attack the credibility of a witness"].)

Finally, even assuming for the sake of argument that this evidence should have been excluded, given its minimal impact compared to the weight of the evidence of defendant's guilt, it is not reasonably likely that admitting it would have led to a different verdict. (See *People v. Cudjo* (1993) 6 Cal.4th 585, 611–612 [exclusion of evidence, even if erroneous, is harmless if it does not appear reasonably probable verdict was affected].) Each of the victims, Doe 1, Doe 2 and Doe 3, gave detailed testimony regarding specific incidents of defendant's abuse that, aside from defendant's self-serving testimony, were not seriously impeached. (*Ante*, pp. 4–11.) Moreover, Angela gave corroborating testimony regarding defendant's habit of putting the boys to bed and often sleeping in the same bed as them—the time and place in which most of the abuse took place. On this record, there is no basis to disturb the trial court's rulings.

16

## II. Constitutional Ban on Ex Post Facto Laws.

Defendant challenges his convictions on counts 1, 4 and 5 as violations of the constitutional prohibition on ex post facto laws. We address these challenges in appropriate order below.

### A. *Counts 4 and 5: Section 288.7.*

Defendant was convicted on counts 4 and 5 under section 288.7, subdivision (b), oral copulation or sexual penetration on Doe 2, a child 10 years old or younger. Defendant seeks reversal of both convictions and their accompanying 15 years to life sentences under the ex post facto doctrine. Defendant's argument is well taken.

"Our state and federal Constitutions prohibit ex post facto laws. (U.S. Const., art. 1, § 10; Cal. Const., art. I, § 9; [citation].) Any law that applies to events occurring before its enactment and which disadvantages the offender either by altering the definition of criminal conduct or [by] increasing the punishment for the crime is prohibited as ex post facto. [Citation.] Section 288.7 was enacted in 2006 and became effective on September 20 of that year. (Stats. 2006, ch. 337, § 9, p. 2590.) The statute created a new offense which imposes an indeterminate life sentence for sexual intercourse, sodomy, oral copulation, or sexual penetration of a child who is 10 years of age or younger. (*Ibid.*; [citation].) Therefore, any application of section 288.7 to conduct that occurred prior to September 20, 2006, is a violation of the state and federal ex post facto clauses." (*People v. Rojas* (2015) 237 Cal.App.4th 1298, 1306 (*Rojas*).)

"The prohibition against ex post facto laws seeks to achieve two important goals. First, it assures 'that legislative Acts give fair warning of their effect and permit individuals to rely on their meaning until explicitly changed.' [Citation.] Second, the rule 'restricts governmental power by

17

restraining arbitrary and potentially vindictive legislation.' " (*People v. Grant* (1999) 20 Cal.4th 150, 158.) A conviction that violates the ex post facto prohibition must therefore be reversed. (*Stogner v. California* (2003) 539 U.S. 607, 632–633.) Moreover, "[an ex post facto] claim may be raised for the first time on appeal and should be reviewed under the harmless error standard described in *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824]. ([*People v.*] *Hiscox* [2006] 136 Cal.App.4th [253,] 258, 261; [citation].)" (*Rojas, supra*, 237 Cal.App.4th at p. 1306.)

Here, defendant contends that an ex post facto violation occurred because it is not possible to determine from the record whether the conduct charged in counts 4 and 5 occurred after the statute went into effect on September 20, 2006. As defendant notes, neither the jury instructions nor the verdict forms identified any particular date ranges for when the charged acts occurred.

Generally, "it is the prosecution's responsibility to prove to the jury that the charged offenses occurred on or after the effective date of the statute providing for the defendant's punishment." (*People v. Hiscox, supra*, 136 Cal.App.4th at p. 256 (*Hiscox*); see *Rojas, supra*, 237 Cal.App.4th at p. 1306.) However, it appears in this case that neither the parties nor the trial court were aware that section 288.7's effective date presented an issue of proof regarding when the charged offenses were committed, as the jury was not asked to make a finding that counts 4 and 5 occurred after the effective date of section 288.7. Under such circumstances, "its verdict 'cannot be deemed sufficient to establish the date of the offense[s] unless the evidence leaves no reasonable doubt' that the conviction was based on an incident that occurred on or after September 20, 2006." (*Rojas, supra*, 237 Cal.App.4th at p. 1306.) The relevant record is as follows.

Defendant acknowledges that "[o]n its face, the information presented no ex post facto issues," as the date range alleged for count 4 was October 22, 2007, to April 1, 2008, and the date range alleged for count 5 was October 22, 2007, to September 30, 2009—both of which were after section 288.7's effective date. At trial, however, the evidence was not so limited. Rather, the record showed acts of oral copulation on Doe 2 that occurred both before and after September 20, 2006.

Specifically, Doe 2 was about six years old when in August 2005 the family moved to Williams Street, where they were living on September 20, 2006. In May or June 2007, when Doe 2 was about nine years old, the family then moved to the Pine Street house. Doe 2 testified about multiple acts of oral copulation that began at the Williams Street house when he was six or seven years old. However, Doe 2 could not pinpoint exact dates for these acts other than to confirm that they occurred during the family's Williams Street residence between August 2005 and May or June 2007—a date range that pre- and postdates section 288.7's enactment.

Further, during closing argument, the prosecutor invited the jury to consider defendant's pre-September 20, 2006 sex acts by directing them to Doe 2's testimony regarding the incidents of abuse that occurred at the Williams Street house: "So counts four and five of the charges are the same type of offense. So it's oral copulation with a child who's 10 years or younger. So—and that the defendant at the time is at least 18 years old, at the time of the offense. So the acts of oral copulation that began back at the Williams residence for John Doe 2, there are multiple incidences [*sic*] where John Doe 2, when he was 10 or younger[,] was orally copulated by the defendant."

The People rely on the date ranges set forth in the information—October 22, 2007, to April 1, 2008, for count 4 and October 22, 2007, to September 30, 2009, for count 5—to argue against an ex post facto violation. However, notwithstanding how the section 288.7, subdivision (b) offenses were charged, the jury instructions on counts 4 and 5 wholly omitted these dates, only setting forth the elements of these offenses.[8]

The People also point to two instructions relating to the timing of the individual counts, CALCRIM Nos. 207 and 3501, to disclaim an ex post facto violation. Neither is helpful.

First, the jury was instructed per CALCRIM No. 207: "It is alleged that the alleged crimes occurred on various dates. The People are not required to prove that the crime took place exactly on that date alleged but only that it happened reasonably close to that day." We are unclear how this language could have sufficed to prevent an ex post facto violation given that the instruction on the offense charged in counts 4 and 5 failed to identify any particular date ranges. As such, the phrase "reasonably close" did not necessarily restrict the jury to evidence of acts occurring after September 20, 2006, the effective date of section 288.7.

Second, as to CALCRIM No. 3501, the jury received the following unanimity[9] instruction: "Except for count 9 (battery with serious bodily

---

[8] As to counts 4 and 5, the jury was instructed: "The defendant is charged in Counts 4, [sic] and 5 with engaging in oral copulation or sexual penetration with a child 10 years of age or younger in violation of Penal Code section 288.7(b). [¶] To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant engaged in an act of oral copulation or sexual penetration with John Doe 2; [¶] 2. When the defendant did so, John Doe 2 was 10 years of age or younger; [¶] 3. At the time of the act, the defendant was at least 18 years old."

[9] To protect a defendant's right to a unanimous jury verdict, "if one criminal act is charged, but the evidence tends to show the commission of

20

injury), the defendant is charged in the information with committing a number of sex offenses spanning various periods of time. [¶] The People have presented evidence of more than one act to prove that the defendant committed these offenses.  You must not find the defendant guilty unless: [¶] 1. You all agree that the People have proved that the defendant committed at least one of these acts, and you all agree on which act he committed for each offense; [¶] OR [¶] 2. You all agree that the People have proved that the defendant committed all the acts alleged to have occurred during this time period."

The People focus on the second prong of CALCRIM No. 3501, which allowed the jury to meet the unanimity requirement by agreeing that defendant committed all the alleged acts in the time period set forth in the information.  The People completely disregard the first prong, however, which alternatively allowed the jury to meet this requirement by agreeing on *which act* defendant committed for each count.  The jury thus could have returned guilty verdicts based on the unanimous belief that defendant committed two acts of oral copulation on Williams Street without considering when the acts occurred.  (See *Hiscox, supra*, 136 Cal.App.4th at p. 261.)

Further muddying the waters, during deliberations the jury sent a note to the court requesting to have certain testimony read back relating to Doe 2's age when defendant orally copulated or sexually penetrated him.  As the court explained, "They're looking for testimony regarding the age of John Doe 2 when oral copulation and/or anal penetration happened.  And then there's a parentheses [*sic*], 'clean up with alcohol,' signed by the

---

more than one such act, '*either* the prosecution must elect the specific act relied upon to prove the charge to the jury, *or* the court must instruct the jury that it must unanimously agree that the defendant committed the same specific criminal act.' " (*People v. Napoles* (2002) 104 Cal.App.4th 108, 114.)

foreperson." This particular incident involving defendant's rubbing alcohol on Doe 2's "butt" occurred at the Williams house, although it is unclear whether it occurred before September 20, 2006.

Nor do the verdict forms provide any certainty as to whether the jury relied on post-September 20, 2006 acts to convict defendant. The verdict forms for counts 4 and 5 state only that the jury found defendant guilty "of the offense charged in Count Four of the Information" and "of the offense charged in Count Five of the Information," to wit, "ORAL COPULATION OR SEXUAL PENETRATION WITH CHILD 10 YEARS OLD OR YOUNGER, upon John Doe No. 2, a violation of section 288.7(b) . . . ." Again, no specific dates are identified.

Under these circumstances, we are left unable to confirm that no ex post facto violation occurred. As explained by our First District colleagues: "It would be inappropriate for us to review the record and select among acts that occurred before and after that date, or to infer that certain acts probably occurred after that date." (*Hiscox, supra*, 136 Cal.App.4th at p. 261.) "For a court to hypothesize which acts the jury may have based its verdicts on, or what dates might be attached to certain acts based on ambiguous evidence, would amount to 'judicial impingement upon the traditional role of the jury.' " (*Ibid.*, quoting *Blakely v. Washington* (2004) 542 U.S. 296, 309.)

Accordingly, based on the record as a whole set forth *ante*, we conclude that a very real possibility exists that the jury relied on acts of oral copulation on Doe 2 at the Williams Street house between August 2005 and section 288.7's effective date of September 20, 2006. Because the record allows for reasonable doubt over whether counts 4 and 5 were based solely on acts occurring on or after September 20, 2006, defendant's conviction and

22

sentence as to both counts must be reversed. (See *Rojas, supra*, 237 Cal.App.4th at p. 1307; *Hiscox, supra*, 136 Cal.App.4th at pp. 261–262.)

We reject as moot defendant's alternative argument that the court prejudicially erred by failing to instruct on certain lesser included offenses for purposes of counts 4 and 5, as well as his argument that the total sentence of 106 years to life constitutes cruel and/or unusual punishment in violation of the state and federal Constitutions. Given our reversal of counts 4 and 5, defendant's total term will be reduced.

B.     *Count 1:  Section 269.*

Count 1 charged defendant with aggravated sexual assault (oral copulation) of Doe 1 in violation of section 269. Defendant argues and the People concede that this conviction violates the constitutional prohibition on ex post facto laws because there is no way to determine whether the jury based its verdict on conduct that occurred before or after section 269 was amended on September 20, 2006. Prior to September 20, 2006, section 269 required at least a 10-year age difference between the defendant and the victim. (Stats. 1994, 1st Ex. Sess. 1993, ch. 48, § 1.) After September 20, 2006, section 269 was amended to reduce the required age differential between the defendant and the victim to seven years. (Stats. 2006, ch. 337, § 6.)

Here, Doe 1 is eight and a half years younger than defendant. Accordingly, defendant could not have committed any act on Doe 1 in violation of section 269 prior to September 20, 2006. We agree with the parties that the record in this case does not establish beyond a reasonable doubt that the jury found defendant guilty of section 269 based on acts committed against Doe 1 on or after September 20, 2006. Similarly to Doe 2, Doe 1 testified to numerous acts of oral copulation that occurred throughout

the family's residence on Williams Street, which spanned from August 2005 to Summer 2007.  (*Ante*, pp. 4–5.)

Accordingly, because defendant's count 1 conviction violates the constitutional prohibition on ex post facto laws, we reverse both the conviction and the accompanying sentence.  (See *Rojas, supra*, 237 Cal.App.4th at p. 1307; *Hiscox, supra*, 136 Cal.App.4th at pp. 261–262.)

## III.    Constitutional Ban on Cruel or Unusual Punishment.

Defendant contends that his 15 years to life sentence on count 8, lewd act on Doe 3, a child under age 14, in violation of section 288, subdivision (a), constitutes cruel or unusual punishment under California law.  Article I, section 17 of the California Constitution prohibits the infliction of "[c]ruel or unusual" punishment.  "A punishment is cruel or unusual in violation of the California Constitution 'if, although not cruel or unusual in its method, it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity.' " (*People v. Baker* (2018) 20 Cal.App.5th 711, 723 (*Baker*), quoting *In re Lynch* (1972) 8 Cal.3d 410, 424 (*Lynch*).)

Under the California Supreme Court's three-part test, to determine whether a sentence is cruel or unusual under the state Constitution, the court must:  (1) consider "the nature of the offense and/or the offender, with particular regard to the degree of danger both present to society" (*Lynch, supra*, 8 Cal.3d at p. 425); (2) compare the sentence "with the punishments prescribed in the same jurisdiction for different offenses which, by the same test, must be deemed more serious" (*id*. at p. 426, italics omitted); and (3) compare the sentence "with the punishments prescribed for the same offense in other jurisdictions having an identical or similar constitutional provision." (*Id*. at p. 427, italics omitted; accord, *In re Palmer* (2021) 10

24

Cal.5th 959, 973 [reaffirming the validity of this three-part test].) Here, defendant limits his analysis to the first and third factors, which we discuss in turn *post*.

A.     *Nature of the Offense and/or Offender.*

Defendant does not dispute that his sentence was mandatory under the relevant statutes given his conviction for committing a lewd act on a child under section 288, subdivision (a) and the jury's finding under section 667.61, subdivision (b) that he committed sexual crimes against multiple victims. (See § 667.61, subd. (b) [establishing mandatory sentence of 15 years to life for a person convicted of multiple enumerated sexual offenses against more than one victim].) Nonetheless, defendant argues that his sentence "is grossly disproportionate to the crime of non-forcible lewd act on a child when that crime is committed fleetingly and over the clothes, and where the jury makes no finding that it involved the genitals or buttocks."

We reject this argument. The Legislature, not the courts, defines and sets the punishment for a particular crime. Under the well-established doctrine of separation of powers, "a court should not lightly encroach on matters which are uniquely in the domain of the Legislature." (*People v. Wingo* (1975) 14 Cal.3d 169, 174; see *Baker, supra*, 20 Cal.App.5th at p. 724.) "Reducing a sentence as otherwise cruel or unusual 'is a solemn power to be exercised sparingly only when, as a matter of law, the Constitution forbids what the sentencing law compels.'" (*Baker, supra*, at p. 724; see *People v. Martinez* (1999) 76 Cal.App.4th 489, 494 ["Only in the rarest of cases could a court declare that the length of a sentence mandated by the Legislature is unconstitutionally excessive"].) We decline to second-guess the Legislature's determination that defendant's 15 years to life sentence on count 8 fits his crime.

Indeed, while "lewd conduct on a child may not be the most grave of all offenses, . . . its seriousness is considerable . . . [and it] may have lifelong consequences to the well-being of the child." (*People v. Christensen* (2014) 229 Cal.App.4th 781, 806; see *Ashcroft v. Free Speech Coalition* (2002) 535 U.S. 234, 244 ["sexual abuse of a child is a most serious crime and an act repugnant to the moral instincts of a decent people"].) Moreover, the vulnerability of the boys given their young ages is an aggravating circumstance. (*Baker, supra*, 20 Cal.App.5th at p. 725.) "California courts have long recognized 'a strong public policy to protect children of tender years.' [Citation.]" (*People v. Wilson* (2020) 56 Cal.App.5th 128, 169.)

Finally, we reject defendant's attempt to focus solely on this one lewd act on Doe 3 without regard to his other repeated and more serious acts of sexual abuse against Does 1 and 2, who, like Doe 3, were vulnerable children entrusted to defendant's care. As the California Supreme Court instructs, "[w]e consider not only the offense in the abstract but also the facts of the crime in question—'i.e., the totality of the circumstances surrounding the commission of the offense . . . .' " (*Baker, supra*, at p. 724; see *People v. Christensen, supra*, 229 Cal.App.4th at p. 806 [finding significant that the defendant "molested not one boy, but three"].) By this measure, defendant's punishment on count 8 was not grossly disproportionate to his individual culpability.

B. *Comparable Sentences for the Same Offense in Other Jurisdictions.*

Nor has defendant established that his sentence fell outside the typical range of sentences for the same offense in other jurisdictions. (See *Lynch, supra*, 8 Cal.3d at p. 427.) Defendant faults the People for relying on statutes from other states listed in *Baker, supra*, 20 Cal.App.5th at pages 730–731, which he argues are inapposite.

26

In *Baker*, the defendant was convicted of oral copulation on a child age 10 or younger and two counts of nonforcible lewd act on a child age 14 or younger. (*Baker, supra*, 20 Cal.App.5th at pp. 717–718.) Upholding the defendant's 15 years to life sentence, *Baker* cited several out-of-state statutes that involved life sentences for oral copulation or sexual penetration of a child, a more serious crime than nonforcible lewd act. (*Baker, supra*, at p. 731, citing, e.g., "Mich. Comp. Laws Serv. § 750.520b(1)(a) & (2)(b) [25 years to life for sexual penetration of a child under 13]; Miss. Code Ann. §§ 97-3-101(3), 97-3-95(1)(d) [20 years to life for sexual penetration of a child under 14]; Neb. Rev. Stat. Ann. § 28-319.01(1)(a) & (2) [15-year minimum for sexual penetration of a child under 12]; R.I. Gen. Laws §§ 11-37-8.1, 11-37-8.2 [25 years to life for sexual penetration of a child under 14].") However, the *Baker* court also cited statutes from Florida, Kansas, and Nevada that prescribe potential life sentences for a lewd act on a child. (*Baker, supra*, 20 Cal.App.5th at p. 731.)

Defendant argues, "Unlike California, . . . Florida defines a lewd act to require a touching of 'the breasts, genitals, genital area, or buttocks, or the clothing covering them.' (Fla. Stat. Ann. § 800.04(5)(b).) Here, Doe 3 gave conflicting statements about whether appellant touched his genitals. [Citations.] The jury made no finding on the issue."

This argument confuses our standard of review. While the issue of whether a punishment is cruel or unusual is one of law subject to independent review, underlying disputed facts must be viewed in a light most favorable to the judgment. (*People v. Wilson, supra*, 56 Cal.App.5th at pp. 166–167.) Accordingly, we assume for purposes of this analysis that the jury accepted Doe 3's statement that defendant touched his genitals. (See *ibid.*) Viewed in this light, the statutes from Florida, Kansas, and Nevada

27

prescribing potential life sentences for a lewd act on a child are indeed relevant and weigh in favor of the constitutionality of defendant's sentence. (See *People v. Wingo, supra*, 14 Cal.3d at p. 179 [a punishment should be viewed with suspicion only "when there appears a significant disproportion between a challenged penalty and that imposed for the same crime by our sister states"].)

In summary, after considering defendant's position, we conclude this case does not qualify as one of the exceedingly rare cases warranting a finding that the imposed sentence is disproportionate to defendant's culpability. (See *Baker, supra*, 20 Cal.App.5th at p. 724.) We thus reject his challenge to the 15 years to life sentence on count 8.

## IV. The Constitutionality of Restrictions on the Right to Youth Offender Parole Hearing Under Section 3051, Subdivision (h).

We next reject defendant's related argument that he was erroneously denied the right to a youth offender parole hearing under section 3051, subdivision (h) based on the life sentence he received on count 8. In so arguing, defendant again relies on the premise, which we just rejected, that his life sentence was unconstitutional. Accordingly, his ancillary claim also fails. We briefly explain.

Section 3051, enacted in 2013, " 'establish[es] a parole eligibility mechanism that provides a person serving a sentence for crimes that he or she committed as a juvenile the opportunity to obtain release when he or she has shown that he or she has been rehabilitated and gained maturity . . . .' " (*In re Trejo* (2017) 10 Cal.App.5th 972, 980–981; see *People v. Franklin* (2016) 63 Cal.4th 261, 279–280 [§ 3051 provides for youth offender parole hearings that give youth offenders "a meaningful opportunity" for release on parole subject to delineated exceptions].) To that end, subject to the exceptions set

forth in subdivision (h),[10] section 3051 entitles a youth offender who committed his or her controlling offense before reaching age 26 to a parole hearing after serving a designated period in custody.[11]  (§ 3051, subd. (b).)

Here, defendant was found statutorily ineligible for a youth offender parole hearing for two reasons.  First, although defendant was age 25 or younger when he committed the sex offenses against Does 1 and 2 charged in counts 2, 6 and 7, he was age 29 when he committed count 8, lewd act on a child under age 14, against Doe 3, an offense for which he received a life sentence.  (§ 3051, subd. (h).)  Second, defendant was sentenced under section 667.61, known as the One Strike law, because he had multiple victims. (§§ 3051, subd. (h), 667.61, subd. (b).)

Defendant argues that the first disqualifier is inapplicable because his life sentence on count 8 was unconstitutional and the second is inapplicable because it violates equal protection.[12]  Having already upheld the

---

[10] Section 3051, subdivision (h) states:  "This section shall not apply to cases in which sentencing occurs pursuant to Section 1170.12, subdivisions (b) to (i), inclusive, of Section 667, or Section 667.61, or to cases in which an individual is sentenced to life in prison without the possibility of parole for a controlling offense that was committed after the person had attained 18 years of age.  This section shall not apply to an individual to whom this section would otherwise apply, but who, subsequent to attaining 26 years of age, commits an additional crime for which malice aforethought is a necessary element of the crime or for which the individual is sentenced to life in prison."

[11] Section 3051, subdivision (b) originally provided that defendants who were under age 18 when they committed their crimes were entitled to youth offender parole hearings.  (*People v. Franklin, supra*, 63 Cal.4th at p. 278.) Effective January 1, 2018, section 3051 was amended to afford the right to such hearings to defendants who were age 25 or younger when committing their crimes.  (§ 3051, subd. (a)(1), as amended by Stats. 2017, ch. 684, § 1.5.)

[12] Specifically, defendant contends section 3051, subdivision (h) violates the equal protection clauses of the federal and state Constitutions by excluding young adults convicted and sentenced for serious sex crimes under

constitutionality of defendant's life sentence on count 8, we conclude that defendant is indeed statutorily ineligible for a youth offender parole hearing pursuant to section 3051, subdivision (h) since he is serving a life sentence for a crime that he committed when he was 29 years old. We therefore need not address defendant's alternative argument based on the equal protection clause.

## V.    Imposition of Statutory Fees and Fines.

Last, defendant challenges the court's imposition of a $1,000 penal fine (§ 672), a $10,000 restitution fine (§ 1202.4), and a $10,000 parole revocation restitution fine (§ 1202.45)[13] as a violation of his constitutional rights to due process and equal protection based on his purported inability to pay, citing *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*). This argument fails.

*Dueñas* involved a challenge to the court's imposition of assessments for court operations (Pen. Code, § 1465.8) and court facilities (Gov. Code, § 70373) brought by a misdemeanor probationer who was homeless and unable to work due to a disability. (*Dueñas, supra*, 30 Cal.App.5th at pp. 1160–1162.) The reviewing court agreed with the defendant's challenge, holding that due process required the trial court to conduct an ability to pay hearing and to ascertain the defendant's ability to pay before imposing these nonpunitive assessments. (*Id*. at p. 1164.)

Here, the court did not impose nonpunitive assessments as in *Dueñas*. Rather, it imposed a $1,000 penal fine pursuant to section 672. (§ 672 [authorizing the imposition of a fine not exceeding $10,000 on a person

the One Strike law from youth offender parole consideration, while including young adults convicted of the equal or more heinous crimes of murder and sexual intercourse or sodomy on a child 10 years old or younger.

[13] Imposition of the parole revocation restitution fine was stayed unless and until defendant is released on parole and commits a parole violation.

convicted of a felony punishable by imprisonment, in relation to which no fine is statutorily prescribed].) Additionally, the court imposed a $10,000 restitution fine under section 1202.4, which requires imposition of such fine where the defendant is convicted of a crime unless the court "finds compelling and extraordinary reasons for not doing so . . . ." (§ 1202.4, subd. (b).) The minimum restitution fine for felony convictions is $300, and the maximum fine, imposed here, is $10,000. (*Id.*, subd. (b)(1).)

Section 1202.4 expressly provides, "A defendant's inability to pay shall not be considered a compelling and extraordinary reason not to impose a restitution fine." (*Id.*, subd. (c).) However, "[i]nability to pay may be considered . . . in increasing the amount of the restitution fine in excess of the minimum fine pursuant to paragraph (1) of subdivision (b)." (*Ibid.*) The burden of demonstrating the inability to pay an amount above the statutory minimum lies with the defendant. (*Id.*, subd. (d).)

The People contend defendant forfeited his right to raise a *Dueñas* challenge by failing to request a hearing before the trial court regarding his ability to pay the challenged fines. This contention is well taken. (See § 1202.4, subd. (c); *People v. Castellano* (2019) 33 Cal.App.5th 485, 490 ["Consistent with *Dueñas*, a defendant must in the first instance contest in the trial court his or her ability to pay"].) Unlike the misdemeanor probationer in *Dueñas*, defendant had a statutory right to an ability to pay hearing that he did not exercise, thus forfeiting his appellate claim that he was entitled to such hearing. Moreover, had he requested this hearing, the same evidence relevant to his inability to pay the $10,000 restitution fine

could also have established an inability to pay the penal fine and the stayed parole revocation restitution fine.[14]

Defendant responds that his attorney specifically objected to the restitution fine on the grounds that he lacked the ability to pay and that the trial court made a finding that he lacked the ability to pay other fees, such as a booking and presentence investigation fee. However, notwithstanding the court's unexplained statement that defendant lacked the ability to pay certain lesser fees or assessments when declining to impose them, the court nonetheless imposed the restitution fine set at the statutory maximum amount, thereby implicitly rejecting defense counsel's inability to pay argument. More importantly, despite defendant's suggestion, he directs us to nothing in the record that demonstrates his inability to pay. "Given that the defendant is in the best position to know whether he has the ability to pay, it is incumbent on him to object to the fine *and demonstrate why it should not be imposed*." (*People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1154, italics added.)

Thus, even were we to excuse defendant's failure to request a hearing on his ability to pay, we would nonetheless conclude that any error under *Dueñas*[15] was harmless beyond a reasonable doubt. (*People v. Johnson* (2019)

_____

[14] Several courts have held that where a defendant does not object to imposition of the maximum restitution fine on grounds of inability to pay, this failure also forfeits claims of inability to pay other fees and assessments imposed in lesser amounts. (E.g., *People v. Smith* (2020) 46 Cal.App.5th 375, 395; *People v. Gutierrez* (2019) 35 Cal.App.5th 1027, 1033 ["if Gutierrez chose not to object to a $10,000 restitution fine based on an inability to pay, he surely would not complain on similar grounds regarding an additional $1,300 in fees"].)

[15] There is currently a dispute among appellate courts regarding whether the constitutionality of imposing certain financial obligations on a criminal defendant should be analyzed under the due process clause and/or

35 Cal.App.5th 134, 139–140.) A defendant's ability to pay is not limited to his or her present financial situation but can also be based on his or her future ability to earn prison wages and money after release from custody. (*People v. Hennessey* (1995) 37 Cal.App.4th 1830, 1837.) Here, the record shows that defendant was not yet 30 years old at the time of sentencing and that he will be serving multiple life terms in prison. Nothing in the record indicates defendant will be unable to work or ineligible for prison work assignments. Even assuming defendant had no available assets at the time of sentencing, he will have ample time to pay the fines assessed against him from his prison wages. (*Johnson*, at pp. 139–140.)

Defendant insists there is evidence that "at least cast[s] doubt on whether he was sufficiently healthy and able-bodied to work in prison." Defendant points to his own testimony that he suffered a significant finger injury while working at the jail that led to a painkiller addiction, and that he took prescription medications for anxiety and depression. These conditions,

---

equal protection clause of the Fourteenth Amendment or the excessive fines clause of the Eighth Amendment. The *Dueñas* court, applying a due process analysis, noted that the imposed financial obligations were also potentially unconstitutional under the excessive fines clause of the Eighth Amendment, but concluded, "The due process and excessive fines analyses are sufficiently similar that . . . '[i]t makes no difference whether we examine the issue as an excessive fine or a violation of due process.' [Citation.]" (*Dueñas, supra*, 30 Cal.App.5th at p. 1171, fn. 8.) Courts have strongly criticized the substantive holding in *Dueñas*. (See, e.g., *People v. Hicks* (2019) 40 Cal.App.5th 320, 326–329, review granted Nov. 26, 2019, S258946; cf. *People v. Kopp* (2019) 38 Cal.App.5th 47, 95–96 ["agree[ing], to some extent, with the court's conclusion in *Dueñas* that due process requires the trial court to conduct an ability to pay hearing and ascertain a defendant's ability to pay before it imposes court facilities and court operations assessments . . . if the defendant requests such a hearing"], review granted Nov. 13, 2019, S257844.) For purposes of this case, and given the state of our record, we need not weigh in on this debate.

assuming for the sake of argument that they are permanent, do not necessarily preclude defendant from taking on work assignments in prison. But even if they did, when exercising its discretion to set an appropriate fine, a trial court is free to consider, among other factors, any money received by a defendant, be it in the form of prison wages or simply gifts from family or friends.  (See *People v. Potts* (2019) 6 Cal.5th 1012, 1055–1056 [concluding trial court could lawfully impose $10,000 restitution fine despite condemned inmate's categorical ineligibility to earn prison wages and his receipt of only occasional small gifts of money from family, and rejecting argument "that a fine is automatically invalid if a defendant is unable to pay it"].)

Thus, for the reasons stated and based on the record at hand, we affirm the court's imposition of these fines.

## DISPOSITION

Defendant's convictions on counts 1, 4 and 5 are reversed.  In all other regards the judgment is affirmed.

_____
Jackson, J.

WE CONCUR:


_____
Fujisaki, Acting P. J.


_____
Petrou, J.


A157214/*People v. Cory Jordan Fisher, Sr.*

35